**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

---

**C.A. No. 14-16139**

---

**L.J., et al,**

**Plaintiffs-Appellants**

**v.**

**Pittsburg Unified School District and Linda K. Rondeau**

**Defendants-Appellees**

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**D.C. No. 13-3854-JSC**

---

# OPENING BRIEF FOR L.J., et al, APPELLANTS

---

**Jean M. Adams, Esq (CA Bar No. 138458)**
**ADAMS ESQ, a Prof. Corporation**
**1300 Clay Street, Suite 600**
**Oakland, CA 94612**
**Tel: 510-832-6000/Fax: 510-832-3099**
**Email: jmurrelladams@adamsesq.com**

**Attorney for Plaintiffs-Appellants**

# TABLE OF CONTENTS

JURISDICTION…………………………………………………………………1

STANDARD OF REVIEW……………………………………………………...1

ISSUES PRESENTED FOR REVIEW…………………………………............1

STATEMENT OF THE CASE…………………………….............................2

SUMMARY OF ARGUMENT…………………………….............................4

A. L.J. is a child with a disability and who should be determined eligible for special education under the IDEA……………4

B. L.J. and his parent are entitled to IDEA procedural safeguards……………………………………………….............6

PROCEDURAL HISTORY…………………………………………………….7

STATEMENT OF FACTS……………………………….....................8

A. L.J.'s Educational History

1. Kindergarten (2008-2009) 5 years-old………………………...8

2. First Grade (2009-2010) 6 years-old………………………......9

3. Second Grade (2010-2011) 7 years-old……………………......9

4. Third Grade (2011-2012) 8 years-old……………………..........12

5. Fourth Grade (2012-2013) 9 years old……………………….……23

6. Fifth Grade (2013-2014) 10 years old………………………..30

B. Tests Administered & Assessment Results………………………….31

1. Academic…………………………………………………........31

2. Behavior…………………………………………..……...33

C. After-Acquired Evidence – The Mental Health School Records…....34

ARGUMENT…………………………………………………….............35

I. The District's Refusal to Include L.J.'s Third Grade Teacher in the Special Education Assessments and Eligibility Determinations Significantly Infringed upon Parent's Right to Participate in the IEP Formation Process………………………………………………..35

A. Plaintiffs Proved That L.J. Is a Child With Qualifying Disabilities………………………………………………….37

1. L.J. Meets Special Education Eligibility Criteria Under the Category of Serious Emotional Disturbance…………………….37

2. L.J. Meets Special Education Eligibility Criteria Under the Category of Other Health Impairment…………………………...38

3. L.J. Meets Special Education Eligibility Criteria Under the Category of Specific Learning Disability……………………......39

B. L.J.'s Chronic and Severe Disability-Related Needs Made Specially Designed Instruction Necessary……………………….40

C. L.J. Proved He Was Eligible Under the IDEA Because He Required Special Education and Related Services To Address Unique Needs Caused By His Emotional Disturbance, Other Health Impairment and Specific Learning Disability…………....46

D. The District Court Erred As A Matter Of Law By Finding Ineligibility Based Upon a Brief Timeframe When L.J.'s Had A Longstanding & Ongoing Need For Special Education…............48

E. PUSD's Specially Designed Instruction was Insufficient to Ensure L.J. Received a FAPE……………………………………………51

III. The District Court erred when it determined that PUSD's failure to provide L.J.'s mental health school records, conduct a nurse's assessment and include Teacher Gonzalez in the eligibility process constituted harmless error………………………….………….52

A. PUSD's failure to disclose L.J.'s mental health school records significantly impeded his Parent's opportunity to participate in the decision-making process………………………………………54

B. PUSD's failure to assess in the area of health significantly impeded L.J.'s parent's opportunity to participate in the decision-making process……………………………………………………59

C. The District's Refusal to Include L.J.'s Third Grade Teacher in the Special Education Assessments and Eligibility Determinations Significantly Infringed upon Parent's Right to Participate in the IEP Formation Process…………………………………………...64

CONCLUSION……………………………………………………………......65

REQUEST FOR ORAL ARGUMENT………………………………………..67

STATEMENT OF RELATED CASE……………………………………….....67

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)………………………67

CERTIFICATE OF SERVICE………………………………………………...68

# TABLE OF AUTHORITIES

## Cases

*Adams v. Oregon,* 195 F.3d 1141 (9th Cir. 1999)……………………….………………48

*Amanda J., v. Clark County School District*, 267 F.3d 877 (9th Cir. 2001)…........62

*Burlington N., Inc. v. Weyerhaeuser Co.*, 719 F.2d 304, 307 (9th Cir.1983)………1

*Dept. of Educ. V. Cari Rae S.*, 158 F. Supp. 2d 1196-97 (D. Haw. 2001)………..51

*Doug C. v. Hawaii Dept. of Educ*.,720 F.3d 1038, 1040 (9th Cir. 2013)…………61

*Forest Grove School Dist. v. TA*, 129 S. Ct. 2484, 2491 (2009)……………..…...51,65

*Gregory K. v. Longview Sch. Dist*., 811 F.2d 1307, 1310 (9th Cir.1987)….……....1

*Hacienda La Puente Unified Sch. Dist. v. Honig*, 976 F.2d 487, 492 (9th Cir. 1992)………………………………………………………………………...52

*Hood v. Encinitas Union High School Dist*., 486 F.3d. 1099 (9th Cir. 2007)…....41

*MM v. Lafayette School Dist.,* 767 F. 3d 842, 841 (9th Cir. 2014)…………….1, 63

*Seattle School Dist. No. 1 v. B.S.,* 82 F.3d 1493, 1500 (9th Cir. 1996)……….…..51

*Simmons v. Pittsburg Unified School District*, Case No.

4:13-cv-04446-KAW……………………………………………………………..62

*W.H. v. Clovis Unified Sch. Dist*., No. CV F 08-0374 LJO DLB, 2009 WL 1605356, at *18 (E.D. Cal. June 8, 2009)…………………………………….........62

**STATUTES & REGULATIONS**

FEDERAL

Title 20 United States Codes

20 U.S.C. 1400 (d)……………………………………………………………..46

20 U.S.C. §§1400-1492…………………………………………………………2

20 U.S.C. §1401(3)(A)……………………………………………….............39

20 U.S.C. §1414(b)…………………………………………….................49

20 U.S.C. §1414(c)……………………………………………..................49

20 U.S.C. §1414(c)(1)……………………………………….…………...........58

20 U.S.C. §1414(c)(2)……………………………………………….............62

20 U.S.C. §1415(b)(1)…………………………………………….………54, 61

20 U.S.C. §1415(b)(3)…………………………………………….................61

20 U.S.C. §1415(i)……………………………………………………...…1

28 U.S.C. §1291………………………………………………………...…1

Code of Federal Regulations

34 C.F.R. §300.1(a)…………………………………………………...........36

34 C.F.R. §300.1(b)…………………………………………………..….......54

34 C.F.R. §300.8(a)(1)……………………………………………….........36

34 C.F.R. §300.8(c)(9)…………………………………………...…..38

34 C.F.R. §300.9(a)……………………………………………………….…54

34 C.F.R. §300.39(a)(1)……………………………………………...........36

34 C.F.R. §300.39(a)(3)……………………………………………………5

34 C.F.R. §300.39(b)(3)……………………………………….……36, 48

34 C.F.R. §300.304(c)(4)……………………………………......………..60

34 C.F.R. §300.321(a)(6)…………………………………….…….55,65

34 C.F.R. §300.501(a)…………………………………….……......55

34 C.F.R. §300.501(b)……………………………………..……….55

34 C.F.R. §300.503(a)…………………………………….……......55

**STATE**

California Education Code (West Supp. 2013)

California Education Code §56026…………………………….........7,46

Cal. Educ. Code, §56026, subds. (a) & (b)…………………….............37

Cal. Educ. Code §56026(a)……………………………..…............37

Cal. Educ. Code §56026(b)…………………………..……...8,40,49

Cal. Educ. Code §56030.5…………………………………...........37

Cal. Educ. Code §56034……………………………………….......5

Cal. Educ. Code §56320(f)……………………………….……60

Cal. Educ. Code §56320(g)…………………………………......60

Cal. Educ. Code §§56505[e][7], 56043[v], and 56504……………..…...54

California Code of Regulations

5 Cal. Code. Reg. §3021.1…………………………….…...…...60

5 Cal. Code Reg. §3023(a)…………………………………......60

5 Cal. Code Reg. §3030…………………………….….................41, 60

5 Cal. Code Reg. §3030(j)(1)………………………..………..39

## JURISDICTION

Pursuant to 28 U.S.C. §1291, the Court of Appeals has jurisdiction to review the final judgment entered by the United States District Court for the Northern District of California. Federal jurisdiction is based upon 20 U.S.C. §1415(i) of the Individuals with Disabilities Education Act (IDEA).

## STANDARD OF REVIEW

This Court reviews the district court's findings of fact for clear error even when they are based on the written record of administrative proceedings. *MM v. Lafayette School Dist.*, 767 F. 3d 842, 841 (9th Cir. 2014)**,** *Burlington N., Inc. v. Weyerhaeuser Co.*, 719 F.2d 304, 307 (9th Cir.1983); *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir.1987). A finding of fact is clearly erroneous when the evidence in the record supports the finding but "the reviewing court is left with a definite and firm conviction that a mistake has been committed." *Burlington N., Inc.*,719 F.2d at 307. Questions of law and mixed questions of fact and law are reviewed de novo. *Gregory K.*, 811 F.2d at 1310.

## ISSUES PRESENTED FOR REVIEW

A. Whether L.J., a Student found to have three disabling conditions, under the IDEA--Severe Emotional Disturbance, Other Health Impairment and Specific Learning Disability--should have been found eligible because he required

and received services constituting special education to address unique needs caused by those disabilities.

B. Whether the School District's Failure to Disclose L.J.'s Mental Health School Records Violated the IDEA and Denied L.J. a FAPE.

C. Whether the School District's Failure to Assess L.J. in All Areas of Disability, Specifically Health, Violated the IDEA and Denied L.J. a FAPE.

D. Whether the School District's exclusion of L.J.'s Third Grade Teacher from its Assessment and the IDEA Eligibility Process Violated the IDEA and Denied L.J. a FAPE.

## STATEMENT OF THE CASE

This appeal continues the quest of L.J. and his family (collectively L.J.) to establish L.J.'s eligibility and secure appropriate special education and related services for L.J, under the IDEA, 20 U.S.C. §§1400-1492, and implementing California law from the Pittsburg Unified School District (PUSD or the District). L.J. challenges the district court's entry of summary judgment against claims that:

(a) PUSD violated multiple procedural and substantive requirements, in part, by withholding material school records, failing to assess L.J. in all areas related to his disability, and excluding his teacher from the evaluation and eligibility processes,

thereby preventing meaningful parent participation in L.J.'s educational decisions and denying L.J. a FAPE; and

(b) PUSD improperly denied L.J.'s IDEA eligibility in conjunction with defective IEP team meetings held in May and October 2012.

The district court reversed the administrative decision, holding that L.J. was a child with a severe emotional disturbance, other health impairment, and a specific learning disability. However, the court held that L.J. did not demonstrate his need for specialized instruction to benefit from his education.

The district court erred when it failed to find that the services L.J. required and received from PUSD constituted special education, as "Specially Designed Instruction" under the IDEA and to recognize L.J.'s ongoing need for special education and related services. The district court's focus on a narrow time frame and the location of services led to its error. The court further erred by finding violation of IDEA procedural safeguards was harmless error.

Undisputed evidence established that L.J. has demonstrated academic, behavioral, emotional and social challenges necessitating special education services since at least the 2nd grade in the PUSD. L.J. is now eleven years old and completed the 6th grade at Spectrum, a non-public school for children with special

needs, where PUSD placed him in April 2014. On May 28, 2015, Parent was notified that Spectrum could no longer serve L.J. as he does not have an IEP.[1]

L.J. requests this Court to determine that the district court and administrative law judge erred and that L.J. is entitled to relief as a matter of law or upon facts not subject to dispute. L.J. requests attorney's fees and costs as the prevailing party on appeal and remand to the district court upon a holding that L.J. was eligible under the IDEA since at least March of 2012; that PUSD denied L.J. a FAPE as alleged and to determine appropriate relief.

## SUMMARY OF ARGUMENT

### A. L.J. is a child with a disability and who should be determined eligible for special education under the IDEA.

L.J. is a child with severe disabilities that met criteria in three separate statutory categories and, by reason thereof, required and continues to require special education and related services. His long history of extreme social, emotional, academic and behavioral challenges at school date back to at least the 2nd grade. He has threatened to kill himself on numerous occasions and attempted to do so. He has been hospitalized in psychiatric facilities for weeks at a time due to the severity of his emotional disturbance and was able to attend school only with a daily regimen of various psychotropic medications. Due to his chronic and

[1] *See*, Appellants' concurrent request for judicial notice (RJN).

severe needs at school and the adapted instruction he still requires to access a basic education, L.J. meets IDEA eligibility requirements.

L.J. has a demonstrated his need for specially designed academic, social, and psycho-educational instruction including *inter alia*: a 1:1 (one-to-one) behavioral aide in the classroom, delivery of instruction by a "male teacher", individual instruction, instruction delivered in a small group, trained staff to prompt him to focus and calm down, extra time and alternate locations to complete class assignments, previewing critical information, repetition of directions to ensure understanding, multi-modal directions, and in-class psycho-education supported by mental health professionals. At all relevant times, L.J. met the definition of a child with a disability because he had three disabling conditions and required specially designed instruction that was adapted by content, methodology and delivery of instruction. 34 C.F.R. §300.39(a)(3).

This case is not moot. In April 2014, due to the nature and severity of L.J.s disabilities, PUSD placed him in Spectrum, a non-public, year-round therapeutic school for children with behavior-related disabilities, but without an Individualized Educational Program or procedural safeguards which the IDEA mandates. He remained at Spectrum illegally through June 2015[2]. PUSD continues to deny L.J.

[2] California law prohibits non-public schools from servicing students absent a current IEP. Cal. Educ. Code §56034. *See*, RJN.

special education eligibility and maintains that his severe degree of impairment does not warrant special education and related services.

**B. L.J. and his parent are entitled to IDEA procedural safeguards**.

For years, L.J.'s mother has sought to identify and obtain the special education placement and services that L.J. needs. As she advocated, she was unaware of material mental health school records kept from her and other IEP team members. PUSD's withholding of these records hid the fact that L.J. had been receiving special education services and supports for years without an IEP. PUSD ignored her express request (and PUSD's prior agreement) to conduct a nurse's assessment, despite L.J.'s known regimen of medications, multiple hospitalizations, entreaties from L.J.'s psychiatrist and psychologist, and it failed to provide prior written notice of its unilateral decision to exclude the school nurse from L.J.'s eligibility and evaluation process. The District excluded L.J.'s most-knowledgeable 3rd grade teacher when it gathered data for assessments and from L.J.'s IEP eligibility meetings, despite her essential knowledge of his disabilities and need for specially designed instruction. These violations of IDEA safeguards prevented meaningful parental participation in L.J.'s IEP team meetings, prevented recognition of L.J. eligibility, and denied L.J. a FAPE.

## PROCEDURAL HISTORY

Administrative Law Judge (ALJ) Margaret Broussard, conducted the administrative due process hearing for three (3) consecutive days, from April 9-11, 2013 and continued the matter to May 6, 2013, for submission of closing briefs. [ER1:17-19; 37] The ALJ denied Student's request for relief from the District's May 30, 2012 and October 9, 2012 determinations of ineligibility and procedural violations. [ER1:17-19; 66]

L.J. appealed the administrative decision and added a civil rights claim that was later bifurcated. [ER378-390] On May 14, 2014, the district court denied L.J.'s motion for summary judgment and granted his motion to expand the administrative record to include newly discovered mental health school records. [ER1-30]

The district court reversed the ALJ's decision, finding that L.J. met the qualifying criteria as a student with disabling conditions of: specific learning disability, other health impairment (due to his ADHD) and serious emotional disturbance. [ER23:13-16, 24:21-22, 26:11-12, 26:21-23]. However, it affirmed ineligibility under the IDEA, primarily based upon erroneous construction of California Education Code §56026, limiting special education as services "which

cannot be provided with modification of the regular school program." [ER26:25-27; 28:1-2].

The district court adopted the ALJ's findings that L.J. was performing well behaviorally, socially and academically between May and October 2012, with services characterized as general education accommodations within the meaning of California Education Code §56026(b). [ER27:1-4;28:14-16]. Therefore L.J. did not require or qualify for special education under the IDEA. [ER28:1-2]. The district court further held that PUSD's withholding of L.J.'s mental health school records, refusing to conduct a health assessment after agreeing to do so, and refusing to include L.J.'s 3rd grade teacher in the eligibility process, did not violate Parent or L.J.'s substantive or procedural rights under the IDEA. [ER30:3-6]

On June 12, 2014, L.J. timely filed this appeal. [ER298] PUSD cross-appealed, challenging the district court's expansion of the administrative record, but withdrew that cross-appeal. [ER296; DktEntry:21]

## STATEMENT OF FACTS

### A. L.J.'s Educational History

**1. Kindergarten (2008-2009) 5 years-old.** L.J.'s impulsive, disruptive, and hyperactive behavior at home escalated at school when he began kindergarten.

[ER644] Inappropriate behaviors grew in terms of frequency, intensity, and severity throughout his school career. [*Id.*] He attended Kindergarten at Highlands Elementary School within the District. [ER683] By year's end L.J., was "distraught" and his behavior "took a nose dive". [ER684]

**2. First Grade (2009-2010) 6 years-old**. L.J. continued at Highlands during the first grade. Although he was "doing fine" academically, he failed to meet District standards in Citizenship and Social Growth, particularly in the areas of listening and following directions, respecting school authority, observing school and classroom rules. [ER682]

**3. Second Grade (2010-2011) 7 years-old**. PUSD transferred L.J. to Marina Vista Elementary School for second grade. His inappropriate behavior and emotional instability were immediately apparent. For example, on September 9, 2010, he was disruptive and defiant all day, talked back to the teacher, threw his work to the ground and refused to follow directions. [ER665] He was removed to Teacher Macias' class due to his behavior. [ER1512-1513] Yet these behaviors continued through the school year and on March 17, 2011, after he hit another

student he was referred "for Lincoln Center"[3] and to "the psychologist to develop a behavior support plan". [ER666, 572].

On March 31st, after being verbally disciplined by his teacher for bullying other students, L.J. told her that he wanted to die and that life was too hard. School staff called L.J.'s mother and mental health staff prepared an emergency suicide evaluation. Staff noted that a therapist would call L.J.'s mother to open his case. [ER666, 571].

After-discovered mental health school records revealed that L.J. qualified for school-based services from the Contra Costa County Health Services, Mental Health Division on April 6, 2011. [ER760]. L.J. demonstrated the requisite "medical necessity" when mental health evaluators determined that he had: (1) significant impairment in at least two of the areas of family, school, self-maintenance or interpersonal relationships; (2) clinically significant and persistent anxiety or mood symptoms; (3) severe stressors; and (4) GAF (global assessment of functioning) in the 51-65 range. [ER793]

Mental Health Clinician Rachel Morgan developed L.J.'s "incentive plan" and staff implemented it on April 18th. [ER883] L.J. began 1:1 mental health therapy on April 19, 2011. [ER882] Despite additional 1:1 therapy sessions on

[3] Lincoln Center is a nonpublic school/agency that provides special education and related services to PUSD students pursuant to contract. [ER884, 904]

April 28 [ER881] and May 13 [ER879], on May 26th, L.J. received a 2-day suspension for leaving the principal's office and punching another child without remorse. [ER666].

L.J.'s 2nd grade teacher and Clinician Morgan reported he was a "very bright student" but struggled greatly with math and behavior. [ER676, 774] He needed to work on social skills with his peers as he often screamed or hit someone on the playground. [ER680] He failed to meet educational standards in almost all areas of Math and in Reading Comprehension and Penmanship. [ER679-680] He failed to meet the District's educational standards for Citizenship/Social Growth, specifically in the areas of respecting the rights and property of others, respecting authority, observing school rules and observing classroom rules. [ER680] L.J. failed to meet 2nd grade California "Proficiency" standards in English-Language Arts and Mathematics on the STAR test. [ER678].

L.J.'s behavior did not improve with the 1:1 mental health counseling. However, as his teacher reported on June 14th, in-class support, weekly individual therapy and increased family involvement did help to decrease his anxiety. [ER878]

- **The 7/4/11 Comprehensive Mental Health Assessment**

On July 4, 2011, Mental Health Clinician Rachel Morgan completed a Comprehensive Assessment of L.J. (the 7/4/11 Comprehensive Assessment). This was PUSD's initial assessment of L.J.'s functioning, and Morgan developed a [mental health] diagnosis and case formulation, based on L.J.'s presenting problems, strengths and needs, as well as his current level of functioning. [ER877] PUSD never disclosed the 7/4/11 Comprehensive Assessment, including L.J.'s formal mental health diagnosis, to his parent who eventually recovered it from Lincoln. [ER308,¶7]

Clinician Morgan's 7/4/11 Comprehensive Assessment documented that L.J. was below grade level in math, easily distracted in class and needed consistent reminders in order to stay on task. [ER774-776] She reported L.J. has difficulty controlling his anger when he perceives that something has been unfair. He lashes out with physical violence toward peers when he becomes angry. He needs one-to-one supervision during his free play time at recess in order to be able to participate peacefully in the physical activities that he enjoys. He's easily distracted by peer conflict in class and has difficulty maintaining focus on his school work. [ER773-782]

**4. Third Grade (2011-2012) 8 years-old.**

**a) Teacher Gonzalez - Marina Vista (8/24/11-3/23/12).** L.J. began his third grade year in Lisa Gonzalez' class on August 24, 2011. [ER706] Ms. Gonzalez was an "enthusiastic new teacher" with prior training and experience as a 1:1 special education aide for children with behavioral issues, including children who "raged." [ER1267:2-3, 1263-1264]. She witnessed L.J.'s "defiant" behavior when she worked at his former school as an aide. [ER1267:2-1268:3]. She agreed to have L.J. in her class. [ER1266:14-25] However, L.J. began exhibiting negative behaviors early in the school year, prompting a student study team (SST) meeting on September 7, 2011 and development of a behavior plan which she followed. [ER1270:7-1273:21;1279:5-25;1281:13-1283:17; 685].

Also on September 7th, L.J. received his first 60-minute individual mental health therapy session, on a "pull-out" basis (i.e. pulled out of the classroom and privately taught in the play room). [ER866]. On September 14th, Therapist Veronica Pope provided 60 minutes of in-class ("push-in") support that included: sitting next to L.J., "processing with him about his disruptive behaviors," providing praise, redirecting him to remain on task, and intervening when he began yelling at a peer. L.J. needed continuing in-class mental health support. [ER865]

On October 3rd, school staff sent L.J. to the office for being disruptive and punished him with detention after in-class interventions proved unsuccessful. [ER666] On October 6th, Therapist Pope provided another hour of push-in support

as L.J. exhibited behavior problems with peers throughout that morning. Therapist Pope sat next to him, prompted him to remove his feet from atop the desk, opened his textbook, guided him to the appropriate page, assisted him in sitting correctly at his desk, engaged in the classroom reading assignment, and provided praise. [ER864] On October 7th, staff again removed L.J. from class and sent him to Therapist Pope for counseling. When he returned to the class, L.J. flopped on the floor, fell out of his chair, kicked backpacks, and was defiant towards Teacher Gonzalez and Therapist Pope. [ER666].

On October 12, L.J. required two hours of intensive in-class support from Therapist Pope who arrived at his classroom to witness him rolling on the floor. [ER875] On October 18th, Therapist Pope provided another two-hour session of intensive in-class support. She arrived at the principal's office and witnessed L.J. sitting under the conference table and refusing to come out. He had been making noises in the classroom and the substitute teacher made him sit in the hall. The school principal refused to allow L.J. to return to class with the substitute teacher because of the severity of his disruptive behavior. [ER873] PUSD discipline records documented that L.J. also was removed from class on October 20th, after screaming and rolling around on the floor, and he spent a long time with Therapist Pope. [ER667]

School discipline records documented L.J.'s need for in-class mental health support again on November 29th, when he was yelling during class. [ER667] By December 1st, L.J. required individual mental health therapy and in-class support t*wice* each week. [ER862]. Therapist Ebony Ambeau retrieved L.J. from the office where he was working on a math test after his removal from class. She coached him on different ways to stay on task. [ER861]

On December 7th, L.J. required 2 hours of intensive in-class support after he refused to stay for in-school morning detention. Therapist Pope, "knowing that [L.J.] struggles with decreasing his behaviors, asked him if he had taken his medication." She worked with him on his assignment and then sat with him in the cafeteria. He continued to require in-class support. [ER872] On December 13th, L.J. required intervention from Therapist Ambeau *and* Clinician Morgan, due to his severe behavior. Although L.J.'s Mental Health Progress Notes documented that he had been sent to the office on in-school suspension, his school discipline records did not disclose any corresponding notation. [ER859, 860, 667]

L.J. continued to see his school-based mental health therapists twice each week after Christmas break. [ER858, 857] By this time however, it was clear to Teacher Gonzalez that L.J. could not function in a large classroom, despite multiple SST meetings [ER1279:9-25;1281:13-21]; 1:1 in-class mental health support [ER1273:14-1274:7]; a "buddy room" [ER1274:8-1275:6]; a 1:1 male

instructional aide [ER1285:15-1286:10]; behavior plans [ER1281:22-1283:1], suspensions, timeouts, audio/visual cuing, medication and various incentive plans. [ER1283:6-17; 1289:1-1291:21; 445; 488]

On January 23, 2012, school staff referred L.J. for transfer to an alternative placement. [ER685] On January 27th, staff told L.J.'s mother he would be removed from Marina Vista and placed in the behavior class at Heights Elementary School. [*Id.*] That segregated behavior class consisted of six African-American boys with a general education teacher and two aides. [ER1525-1528;488:1-13]

On January 31st, Therapist Pope provided L.J. two hours of intensive support and playground rehabilitation work. She escorted him to a "back-up classroom". [ER869] On February 21st, Therapist Pope met with L.J.'s instructional aide to provide possible interventions, including: allowing L.J. time to calm down while providing a soothing presence and playground time for energy release. . [ER868] Teacher Gonzalez contacted the District offices to request additional support for the aide because L.J.'s behaviors were so severe. [*Id.*] Those interventions were unsuccessful and on March 13th, staff recommended L.J.'s expulsion. [ER685]

Meanwhile, L.J.'s mother had retained counsel and the parties engaged in mediation. As part of the final settlement agreement, the parties agreed to L.J.'s temporary placement in a general education third grade class at Los Medanos

Elementary School with a 1:1 trained behavioral aide and a psycho-educational and functional behavioral evaluation to be conducted by Dr. Sherry Burke. [ER1158-59]. Accordingly, L.J. transferred from Marina Vista effective March 27, 2012. [ER1421:19-20]

L.J's February 3, 2012 report card indicated that he again failed to meet District standards for Citizenship and Social Growth in categories of: staying on task, following rules, respecting authority, working with others, completing class work and working neatly. [ER677] Although he was making progress toward End-of-Year Standards in most areas of Reading and Writing, he was making insufficient progress in most areas of Math. [ER675]. Teacher Gonzalez reported that L.J.'s many days out of school from suspensions and behavior problems led to not reaching his potential. [ER676] He had the potential to do "really well" in language arts, but needed 1:1 instruction in math. [ER1291:22-1292:10] L.J.'s 3rd grade standardized test scores showed that he again failed to meet California proficiency standards in English-Language Arts and Mathematics, remaining in the "Basic" range. [ER587]

**b) Teacher Ramos – Los Medanos ES (3/27/12 – 6/11/12)** On March 27, 2012, L.J. began attending Teacher Romell Ramos' third grade class at Los Medanos Elementary School. Pursuant to the settlement agreement, PUSD provided L.J. a trained, 1:1 Paraeducator, Brian Aranio, who acted as his behavior

coach from March/April through May 29th or 30th [ER1158-59; 1592:5-25], provided 1:1 instruction [ER1615:10-19] and communicated frequently with L.J.'s mother. [ER1602-1603; 600; 649]. L.J. had no disciplinary infractions, tantrums, or outbursts and his mother was pleased with this placement. [ER629].

L.J.'s March 26th behavior plan targeted impulsivity and refusal to follow directions. [ER628; 692-695]. With the interventions Paraeducator Aranio provided, L.J. began to improve academically and behaviorally. [ER1608;1614] However, L.J. still experienced "melt downs" when frustrated by classroom assignments. [ER1597;655-658] L.J. required an effective "team" including parents, teachers, a behavioral aide supported by a trained behaviorist, principals and school psychologists. [ER1375-1376,1379-1380]

Then in April 2012, L.J. wrapped a seatbelt around his neck, and while saying he wanted to die, began rolling around uncontrollably trying to rub his face on the ground, so he was taken to the emergency room. [ER482-483;644, 483].

On April 20th, L.J. attended his first school-based therapy session with Therapist Harrington, who noted his "fairly flat affect". [ER855]. On April 27th, L.J. again presented with a "flat affect and minimal eye contact." [ER854] On May 17, 2012, L.J.'s mother warned Therapist Harrington that L.J.'s improved

behavior was mostly due to medication and when it wore off, he again became very defiant, aggressive and angry. [ER851]

Late on May 29th, L.J. attempted to kill himself by sticking his finger in the light socket and putting items down his throat. He said that everyone hated him and he did not want to live. [ER625]. On May 30, 2012, L.J. was confined to a psychiatric hospital for over a week and missed six school days. [ER5; 701]

Also on May 30th, PUSD convened L.J.'s initial IEP meeting and deemed him ineligible for special education and related services. [ER618-621] Without knowledge of L.J.'s mental health school records, his mother waived the attendance of his mental health clinicians at the IEP meeting and the IEP team received only a paragraph summary of his mental health needs. [ER762-763]

Throughout L.J.'s time in Mr. Ramos' class, Paraeducator Aranio sat with L.J. in the back of the classroom and remained within "arm's length" of him, up to L.J.'s psychiatric hospitalization on May 30. [ER1594;1339-1340] Paraeducator Aranio was trained by PUSD's top behaviorist and frequently checked in with him. [ER1587-1588;1590-1592;1603] He was "very effective" and "highly motivating" and "almost" kept L.J. on task. [ER1329] It was Paraeducator Aranio (*not* Teacher Ramos) who followed the behavior plan with "fidelity". [ER1374-1375] Ramos

simply "looked over it" and was never trained to follow any behavior plan. [ER1320]

Dr. Burke's supplemental evaluation of October 2012 stated that Aranio "faded back" services. [ER600] However, both Paraeducator Aranio, and Teacher Ramos testified that Aranio remained with L.J. through the end of the year at least until his May 2012 psychiatric hospitalization and was within "arm's length". [ER1594;1313-1314;1339-1340] Burke's initial psychoeducational evaluation report of May 25, 2012, confirmed that Paraeducator Aranio had not yet faded-back, because Burke had not recommended that he do so. [ER641] Further, in a May 25, 2012 Functional Analysis Assessment, Dr. Burke reported that she observed Paraeducator Aranio sitting within "close proximity" to L.J. near the back of the classroom and is "in a position to help teach and rehearse new skills with L.J. in the classroom setting". [ER647; 649] Her contrary recollection at hearing a year later was inconsistent with both of her contemporaneous reports. [ER996;1010]

L.J. exited mental health services, effective June 15, 2012. He reportedly made moderate progress. [ER760] Therapist Harrington recommended family therapy to address L.J.'s mother's concerns about his behavior at home, but warned that, without supports, L.J.'s improved behavior might deteriorate.

On June 25th, ADAMS ESQ formally requested L.J.'s school records from PUSD, including records from Los Medanos and Marina Vista schools, seeking a complete copy of his educational file. [ER535-539] The attorney submitted additional requests for school records on June 28th, October 12th, November 29th [ER540-561] and March 22, 2013. [ER526-531] PUSD never disclosed L.J.'s mental-health school records despite these records requests. [ER308,¶7; 1565] Nor did PUSD provide L.J.'s mother with copies of health records obtained by PUSD despite her express request. [ER615, 1126-1128;1132-1133]

In the summer of 2012, L.J. was admitted for psychiatric hospitalization on two additional occasions, on July 17th and again on July 26th, when he was detained as danger to self/others when he was banging his head and threatening to harm himself/others. [ER304, 612] L.J. received diagnoses of ADHD and Mood Disorder NOS and was placed on psychotropic medications, Adderall, Seroquel and Wellbutrin to help stabilize his mood and sustain focus and later Vistaril was added to treat his anxiety. [ER612; 722-735; 1513;1545-1551 ]

L.J. commenced a second IDEA due process request on July 27, 2012 and the parties participated in mediation August 23, 2012. [ER481-498; 614] PUSD did not offer placement at L.J.'s home school, Marina Vista. Instead, the parties agreed to place L.J. at Willow Cove Elementary School on an interim basis

pending PUSD's review of L.J.'s psychiatric hospitalization records and to allow Dr. Burke to update her report with the new information. [ER614]

L.J.'s mother did not give permission to release L.J.'s sensitive psychiatric records unconditionally. Instead, she expressly conditioned her consent on: (1) the school nurse's health evaluation (where health information and testing is gathered to determine how L.J.'s health and medications affected school performance); (2) her receipt of copies of all documents provided to PUSD by the hospital and psychiatrist; (3) receipt of all assessments and updates at least three days prior to the scheduled IEP meeting; and (4) that Dr. Burke's assessment must include information provided by L.J.'s 3rd grade teacher Lisa Gonzalez. [ER616;1541-1542;1543]

In August 2012, 3rd grade teacher Ramos received a call to come to the office and complete L.J.'s report card for his third trimester. Based solely on his recollection and work L.J. completed in 48 school days that L.J. was present in his class [ER701], Teacher Ramos entered hand-written grades to reflect that L.J. met PUSD's educational standards in all areas. [ER1322-1324] This is inconsistent with standardized tests given just weeks later which showed L.J. was below basic in Math and Basic in English and therefore had not met proficiency standards. [ER562,565] Ramos confirmed that L.J.'s absences *did* adversely affect his academic performance in his class. [ER1324-1325]

### 5. Fourth Grade – (2012-2013) 9 years-old.

L.J. joined Teacher Aaron Hatfield's fourth grade class at Willow Cove Elementary School shortly after the August 23, 2012 mediation. PUSD specifically chose Teacher Hatfield to teach L.J. because he had extensive training and experience working at a charter school for children with behavioral challenges. [1210-1211] Without his 1:1 aide, individualized school-based psycho-therapy, or behavior plan from the prior school year, L.J. was wholly dependent on psychotropic medications to address his anxiety, impulsivity, aggression and mood swings. [ER1491 1561].

Teacher Hatfield applied his experience and strategies he learned from previous employment at the Antioch Unified School District, to adapt the content, methodology and delivery of instruction, knowing L.J.'s unique disability-related needs in the areas of behavior (impulsivity, mood swings, lack of self-control, refusal to apologize) and academics (English Language Arts and Writing). [ER1211,1222-123,1240,1244,1247-48,1252,1255; 586]

Teacher Hatfield provided L.J. with small group instruction, seating next to his desk, extra time for assignments, pre-learning of tasks and he provided frequent reminders, knowing L.J. relied upon routine. Teacher Hatfield further adapted the delivery of instruction and methodology by providing a set schedule for L.J. to

follow; warning L.J. before to prepare for upcoming transitions; providing L.J. with oral and written (multi-modal) directions; and, redirection from a male teacher. Teacher Hatfield also permitted and reminded L.J. that he could: leave class for a short break when necessary or go to the office at will; receive help in another classroom; take tests or complete class work during recess or in the school office, and Teacher Hatfield called on L.J. immediately when L.J. raised his hand. Teacher Hatfield employed a 'blurt box"; restated directions and expectations to L.J.; repeatedly redirected him; talked to him outside of the classroom, and changed L.J.'s seat to facilitate calm. [ER1211-1255; 581-583,586-587, 578, 574] Teacher Hatfield provided assignments for L.J. to work on in the office and went to the office to "help him out" on a one to one basis. [ER578]

Six weeks into 4th grade, on October 9, 2012, PUSD convened a second "initial" IEP meeting, by agreement of the parties. District IEP team members again deemed L.J. ineligible for special education. [ER596-598].

It is undisputed that with psychotropic medication and the specially designed instruction from Teacher Hatfield, L.J.'s behavior and learning temporarily improved in 4th grade, compared to severe episodes in Teacher Gonzalez' 3rd grade class. However, the nature of Teacher Hatfield's skill and experience, and his extensive adaptations to content, methodology and delivery of instruction for L.J., confirmed L.J.'s need for specially designed instruction designed to address his

unique needs caused by his disabilities. L.J.'s relative success with Teacher Hatfield's individualized services demonstrated that L.J. was eligible under the IDEA and *capable* of academic, social and behavioral success. The record confirmed that L.J. continued to require additional specialized instruction *at this time* to address his behavior (especially with substitutes) and academics. [*Supra*., pp.23-24]

L.J.'s emotional dysregulation caused his two-day suspension on September 25, 2012, after he eloped from the school campus, ran into the street, took a swing at Principal Juan Gonzalez and threatened to kill him. [ER576] Shortly before the October 9, 2012 IEP Meeting, L.J. was unable to ride the school bus because he refused to follow the directions of the bus driver. [ER575] Shortly after the October 9, 2012 IEP Meeting, staff sent L.J. to the office for kicking his classmate in the knee (where he had just had surgery) not listening, disrupting class and refusing to complete his work. [ER672; 573-574] On November 26, 2012, staff removed L.J. from the classroom after he called one student names and spit on another. L.J.'s outbursts intensified after lunch and when Teacher Hatfield attempted to counsel L.J. after school, all he did was "smile and laugh". [ER571-572] On December 20, 2012, L.J. was sent to the office for a time out after disrupting the class. In the office, L.J. refused to follow directives and staff contacted his mother to pick him up. [ER671]

Despite hearing testimony praising L.J.'s improvements, undisputed evidence which PUSD withheld showed that L.J. continued to struggle with his disabilities throughout his time in Teacher Hatfield's class. Paraeducator Aranio, who by the Fall of 2012 was assigned to another student at Willow Cove, observed that L.J. "oftentimes" got into trouble on the playground during recess. [ER1611]. Teacher Hatfield's award of high marks in all areas of Citizenship/Social Growth was inconsistent with records PUSD withheld, which revealed L.J.'s continuous challenges with self-regulation, respecting authority, accepting responsibility and impulsivity and Teacher Hatfield's own reports to mental health staff. [ER671; 581-583, 586-587; 751,755,757]

Newly discovered mental health school records confirmed that L.J. avoided discipline because he was frequently sent (or allowed to take himself) to the principal's office. For example, around January 16, 2013, L.J. struggled to focus on classroom related tasks, fidgeted in his seat, had "high energy", blurting out information and refused to follow directions, despite Teacher Hatfield's consistent redirection and support. [ER841] Teacher Hatfield confirmed L.J. "usually struggles with substitute teachers," and requested in-class support from Therapist Randa Bandak, Principal Plunket and Vice Principal Winkler. [ER839]

- **The 2/15/13 Comprehensive Mental Health Assessment**

Meanwhile, on October 11, 2012, two days after L.J.'s IEP Meeting, PUSD Special Education Director Debbie Daly initiated the resumption of mental health services for L.J. [ER764-765] Pursuant to Director Daly's request, L.J. was readmitted to mental health counseling services in December 2012 and received a mental health assessment dated February 15, 2013. [ER750]

Teacher Hatfield participated in the readmission process, voicing his concerns about L.J.'s behavior and impaired focus, especially when there was a substitute teacher. [ER751] Teacher Hatfield reported that L.J. struggled with focusing and remaining seated in class, was easily triggered during recess and less structured settings, resulting in peer conflicts, blurted out in class and had difficulty with on task behaviors like remaining seated, focusing and completing tasks, particularly with a substitute teacher. [ER755] L.J. struggled with interpersonal strengths more than any other area. Of particular concern were L.J.'s difficulties with requesting support from peers and enjoying and identifying his feelings. [Id.]

Mental Health Clinician Paula Gonzalez diagnosed L.J. with ADHD, concurring with his psychiatrist[4]. Clinician Gonzalez reported L.J. had difficulty sustaining attention in tasks or play; had difficulty listening to directions; was

[4] Although PUSD had received all psychiatric hospital records in January 2013, they apparently were not shared with mental health assessors. [ER754;1132:5-19]

fidgety and forgetful in daily activities; and had difficulty organizing tasks. Those symptoms caused clinically significant impairment in L.J.'s social and academic functioning. [ER755-756].

Clinician Gonzalez concluded that L.J. relied extensively on medications and evidenced functional impairments in the areas of family relations, school performance and peer relations. His symptoms encompassed areas of cognition/memory/thought, attention/impulsivity, socialization/communication, depression, anxiety/phobia/panic attack, affect regulation, oppositional conduct, destructive/assaultive and somatic disturbance. [ER758] L.J.'s impairments included all of those observed in PUSD's 7/4/11 Comprehensive Assessment—and more, thus indicating some *regression* in L.J.'s mental health. [ER845]

L.J. continued to flounder after his February 2013 Assessment. On March 6th, L.J. spent the majority of his class time yelling and interrupting and could not change his behavior when staff addressed it. [ER671] On March 15th, Therapist Gonzalez found L.J. sitting alone in the office. He could not concentrate in class and was talking back. [ER820] On March 18, Principal Plunkett requested Therapist Bandak's assistance when L.J. refused to follow his teacher's instructions and could not manage his frustration level in class. [ER819] On March 22, Therapist Gonzalez again found L.J. sitting alone in the office. She reported, L.J. had "hyper energy" and could not focus in class. [ER817] These

reports all support L.J.'s mother's testimony that Hatfield could not keep L.J. in the classroom. [ER1561] Yet PUSD described him as doing "great". [ER1420]

On April 11, 2013 Teacher Hatfield testified that L.J.'s specially designed instruction included being allowed to leave the classroom at will. [ER.1227-1228,1246]. He sent L.J. to the office a few times and L.J. chose to go the office 4-5 times. [ER1246] Teacher Hatfield suggested that he may have been sent out more times with substitute teachers. [*Id.*] Hatfield could not even guess as to the number of times L.J. took a "timeout". [ER1247:4-9]. This adapted delivery of instruction was necessary because L.J. could not work in a large group and required small group instruction or working independently. [ER1219,1225,1240:15-19, 1257;586]

On April 16, 2013, L.J.'s mother received a telephone call from "Isabel," secretary to Vice Principal Winkler at Willow Cove. Isabel told L.J.'s mother that L.J. was being very difficult, not listening and being disruptive. [ER395]

On Wednesday, April 24, 2013at 1:27 p.m., L.J.'s mother received a second, more urgent communication from Secretary Isabel asking her to immediately pick up her son from school because he was being disruptive and defiant both in the classroom and the office. L.J. eventually eloped from the office. [Supplemental Evidence]

On April 29, Therapist Bandak provided 1:1 service to L.J. for 25 minutes during class because L.J. could not focus or comply with directives, struggled to manage impulsivity, exhibited "high energy," was fidgeting and "blurting out" words and had difficulty self-regulating. [ER813] By May 3rd, L.J. had been struggling to manage his impulsivity and frustration at school for "almost two weeks in a row." [ER811]

**6. Fifth Grade (2013-2014) 10 years-old.** In 5th grade, L.J. physically injured multiple children and at least one teacher. L.J. was suspended for "kicking and hitting" his science teacher calling another teacher "stupid" eloping from the room and later brandishing a fake knife in the classroom. [ER311] On November 12, 2013, he received detention for hitting a girl forcefully (her back had to be iced due to the severity of the blow). On November 26th, he was rushed to the emergency room by ambulance after attempting to hang himself with a lanyard. [ER 306,311]

On January 7, 2014, 5th grade Teacher Schnurr reported that L.J. would throw himself down on the floor and scream, opined that "he is obviously emotionally disturbed", and warned the effectiveness of the classroom aide to help control L.J. was deteriorating, and L.J. appeared "chaotic in behavior". [ER308]. L.J.'s mother reported her concerns that L.J. was throwing rocks at people at school and that school officials called her multiple times throughout the year to

take him out of school early due to his behavior. [ER307.] Staff suspended L.J. on another occasion because he endangered a classmate by putting expandable pellets in the classmate's water bottle without his knowledge. Another student witnessed L.J.'s behavior and prevented the peer from ingesting the pellets. [ER231:7-17]

**B. Tests Administered & Assessment Results**

Formal testing confirms L.J.'s disability-related academic, behavioral and social/emotional impairments gave rise to his need for special education and related services.[5]

**1. Academic**

Although IQ tests are prohibited here because L.J. is African-American, teacher observations and informal testing confirm, L.J. has at least average cognitive ability, and likely high intellectual ability, and he is capable of scoring in the "proficient" range and above on standardized tests. [ER1249] L.J. scored only in the "basic" range on second and third grade State standardized tests. [ER678, 587] Standardized academic testing that Dr. Burke performed after L.J.'s six weeks with Paraeducator Aranio, ranked his academic performance in an overall average range. [ER673-638] However, she noted that L.J. responds immediately

[5] The results of academic and behavior-related testing are discussed here and the social/emotional testing is addressed by the 7/4/11 and 2/15/13 comprehensive mental health assessments. *Supra.*, pp. 11-12 and 26-28.

to questions and needs to be systematically taught the process of taking time to process the information, analyzing, and then answering. [ER634] Benchmark testing demonstrated L.J.'s progress to "Proficient" by February 2013 but he remained "Basic" in Mathematics. [ER567,564]

Based on the above evaluations, it is undisputed that L.J.'s ADHD and Mood Disorder **substantially** impaired his learning when supports were not in place. Estimation of L.J.'s impairments included an "educated guess without the mitigation of medication". [ER581,587] Teachers Gonzalez, Ramos and Hatfield concur that L.J.'s disabilities and classroom absences due to disability-related behavior or hospitalization negatively impacted his academic performance and that a discrepancy exists between his academic potential and achievement absent adapted educational supports. [ER674, 676, 1291;1221;1324-1326]

**2. Behavior**

Educational Psychologist Sherry Burke conducted a behavior assessment dated 5/25/12 (the "5/25/2012 FAA"). [ER643-651] The 5/25/12 FAA was based upon systematic observations using both formal and informal methods, as well as school records review and data collected by the behavioral coach. [ER645] Burke concluded that L.J. had highly impulsive behaviors, ranging from "mild to severe," including wiggling his body, standing up out of his seat, blurting out whatever he

was thinking, falling out of his seat, hitting staff and peers, and spitting on teachers and support staff. His education was impeded and his safety and learning and that of others was compromised by the moderate to severe behavioral events. [ER645] Dr. Burke concluded it was probable that having too much activity around him added to L.J.'s distraction and sensory overload. [ER647] He was hyper-sensitive to feeling criticized or that he was not being treated equitably, and appeared unable to regulate his emotions effectively. [ER647-648] A key support was L.J.'s paraeducator, who helped teach and rehearse new skills with L.J. in class. [ER649] Burke's testing indicated that L.J. had recently learned to stay focused on personal goals, make better behavioral choices, and to de-escalate when verbally cued. [ER648]

After Dr. Burke's September 21st re-assessment of L.J.'s behavior, she completed a supplemental psychoeducational report on October 3, 2012. [ER599] In the classroom, L.J. was positioned closest to the teacher and direct instruction. [ER605] Thematic issues she presented in the Roberts-2 test indicated mild aggression in peer interactions and overreliance on others to solve his problems. [ER607] The Clinical testing revealed that L.J. "doesn't yet know how to control his impulses and anger. It is clear [L.J.] continues to struggle to accept full responsibility for his own actions and has a tendency to blame others for his trouble." Burke added, "he finds it hard to self-soothe and has a tendency to

overreact behaviorally." L.J.'s mother's report from the Achenbach Child Behavior Checklist, placed him at risk (60-69) or clinically significant (70 and above) in all areas with elevated scores in the areas of somatic complaints, attention problems and aggression. Teacher Ramos' report placed him in the at risk range for anxiety and depression, and Teacher Hatfield identified him as "at risk" for aggressive behavior. [ER608] Consistent with the diagnosis of L.J.'s ADHD, he was inattentive, could not sustain concentration, and had great difficulty sitting still. All behavioral symptoms grew in frequency and intensity and his physical manifestations of stress, such a head and stomach aches, increased. [ER608-609] As with her 5/25/12 psychoeducational assessment, Burke attributed a discrepancy between parent and teacher observations, at least in part, to the fact that L.J. had only been in Hatfield's classroom for five weeks [ER609] and had only been in Teacher Ramos' class for six weeks. [ER637] Despite prior conclusions in Dr. Burke's 5/25/12 FAA, she conceded in October 2012 that L.J. had **not** mastered strategies for dealing with his anger, nor was he able to self-soothe or de-escalate when angry. [ER609]

### C. **After-Acquired Evidence – The Mental Health School Records**

On February 12, 2014, pursuant to a subpoena, Lincoln, (PUSD's mental health agency) produced documents to L.J., including: its contract with PUSD to provide special education and related services; certain email communications;

numerous progress notes spanning two school years; and, two "Comprehensive Assessments" prepared by its mental health staff at PUSD's request. [ER736-943]. The assessments were part of L.J.'s heretofore undisclosed mental health school file. L.J.'s mother reviewed the newly disclosed Mental Health School Records for the first time on February 19, 2014. [ER308]

L.J.'s mother repeatedly had requested a mental health evaluation to establish whether L.J. qualified for special education and had requested complete copies of her child's file—including the "counseling report" referred to at the May 30, 2012 IEP meeting. [*Supra.*, p.20] At hearing, PUSD witnesses denied the existence of any mental health evaluations. [ER1147-48] or nurses assessments. [ER1144:20-22] However, as the district court recognized, PUSD had indeed commissioned two comprehensive mental health assessments from its on-site mental health service provider Lincoln, but had never provided the assessments to L.J.'s mother or her counsel. [ER12-13]

## ARGUMENT

### I. L.J. IS A CHILD WITH EXCEPTIONAL NEEDS, ENTITLED TO SPECIAL EDUCATION ELIGIBILTY UNDERTHE INDIVIDUALS WITH DISABILITIES EDUCATION ACT & CALIFORNIA LAW.

The Legislature enacted the IDEA to ensure that all children with disabilities have available to them a free, appropriate public education that emphasizes special

education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living. 34 C.F.R. §300.1(a). A *child with a disability* means a child properly evaluated as having one or more disabling conditions, including serious emotional disturbance, other health impairment, and specific learning disability) and who by reason thereof, needs special education and related services. 34 C.F.R. §300.8(a)(1). *Special education* "means specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including instruction conducted in the classroom, home, hospitals, institutions and other settings and instruction in physical education." 34 C.F.R. §300.39(a)(1). *Specially designed instruction* means "*adapting*, as appropriate to the needs of an eligible child under this part, the *content, methodology, or delivery of instruction* (i) to address the unique needs of the child that result from the child's disability; and (ii) to ensure access of the child to the general curriculum *so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children*." 34 C.F.R. §300.39(b)(3), *emphasis added*.

The district court approached special education eligibility as a two pronged-test: 1) whether L.J. met the eligibility criteria as a *child with a disability*; and 2) whether, as of the May 30th or October 9th IEP meetings, he demonstrated a *need for special education and related services*. 34 C.F.R. §300.8(a)(1).

### A. Plaintiffs Proved That L.J. Is a Child With Qualifying Disabilities

L.J. met the first prong of the eligibility test, as the district court concluded he met the eligibility criteria under the classifications of: (1) Serious Emotional Disturbance; (2) Other Health Impairment, due to his Attention Deficit Hyperactivity Disorder; and (3) Specific Learning Disability. [ER23:13-16, 24:21-22, 26:11-12, 26:21-23] Cal. Educ. Code §56026(a). L.J. met eligibility criteria as *Severely Disabled* under California law due to his serous emotional disturbance. Cal. Educ. Code §56030.5.

#### 1. L.J. Meets Special Education Eligibility Criteria Under the Category of Serious Emotional Disturbance.

A student may be eligible for special education and related services under the disability category of Serious Emotional Disturbance (SED) if, because of this condition, he exhibits one or more delineated characteristics over a long period of time, and to a marked degree, which adversely affect educational performance. (Cal. Educ. Code, §56026, subds. (a) & (b); Cal. Code Regs., tit. 5, §3030, subd. (i).) L.J. qualified as a child with a disability under ED as he exhibited "inappropriate types of behavior or feelings under normal circumstances" to a marked degree which adversely affected his educational performance. [ER24-26]. The district court found that the ALJ improperly failed to take into consideration the overlay of interventions that L.J. was receiving during the relevant time frames.

[*Id.*] Further, the ALJ's factual and legal conclusions were incorrect because she erroneously found that all of L.J.'s hospitalizations took place in the summer and he did not miss any school. [*Id.*] The court found, the ALJ should have considered L.J.'s psychiatric hospitalization, which provided insight into his condition at the time of the May 2012 IEP meeting. [*Id.*] The district court properly reversed, finding the ALJ erred by concluding L.J.'s behaviors did not adversely affect his educational performance. [*Id.*] The ALJ again failed take into account accommodations or modifications that masked the adverse effects of L.J.'s disability and the court held, L.J. met disability criteria for SED. [*Id.*]

### 2. L.J. Meets Special Education Eligibility Criteria Under the Category of Other Health Impairment.

A child is disabled by "other health impairment" when he has limited strength, vitality, or alertness, including a heightened alertness to stimuli, that result in limited alertness with respect to the education environment that (1) is due to a chronic or acute health problem such as ADHD, and (2) adversely effects a child's educational performance. 34 C.F.R. §300.8(c)(9).

The district court held that the ALJ erroneously concluded that L.J. failed to produce evidence to prove his ADHD or Mood Disorder caused limited strength, vitality, alertness or heightened alertness to environmental stimuli. [ER23:17-24, 22] Again, the ALJ failed to consider the interventions PUSD provided for L.J.

when the ALJ found L.J. did not satisfy the OHI disability criteria. [*Id.*] The district court properly reversed and held L.J.'s ADHD and Mood Disorder adversely affected his behavioral, social and academic development at the time of the May and October 2012 IEP meetings and L.J. met eligibility criteria under the classification of OHI. [*Id.*]

### 3. L.J. Meets Special Education Eligibility Criteria Under the Category of Specific Learning Disability.

A child has a specific learning disability when: (1) he has a disorder in one or more of the basic psychological processes involved in understanding or in using language…that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations; and (2) that disorder results in a severe discrepancy between intellectual ability and achievement. 20 U.S.C. §1401(3)(A) By definition, a disorder in a basic psychological process includes an attention disorder. 5 C.C.R §3030(j)(1). It is undisputed that L.J. is disabled by Attention Deficit Hyperactivity Disorder (ADHD) and has carried this diagnosis since 2010. The district court properly held that L.J. satisfied the first element of eligibility in this category.

L.J. also satisfied the second statutory element in this category. It is undisputed that L.J. is of at least average intelligence. Absent specially designed amelioration, L.J. consistently fell below his intellectual ability level and below

academic proficiency levels applicable to children by grade level. [ER20-23] The district court correctly held that L.J. established he met disability criteria for a specific learning disability during the relevant time period. [*Id.*]

L.J. met the special education eligibility criteria under three classifications of Emotional Disturbance, Other Health Impairment and Specific Learning Disability. However, the district court erred, as a matter of law, by holding that the extensive interventions L.J. received and required, since 2nd grade, constituted "modification of the regular school program," pursuant to California Education Code §56026(b), that differed from special education services under the IDEA. The district court thereby erred to find that "modification" of instruction within PUSD's regular school program addressed L.J.'s related disabilities needs, academically, socially and behaviorally, and therefore L.J. did not require special education under the IDEA. [ER26:24-29:11]

**B. L.J.'s Chronic and Severe Disability-Related Needs Made Specially Designed Instruction Necessary.**

California regulations promulgated to implement the IDEA address the requirements for special education eligibility as rights of children with "exceptional needs," stating, in part:

> A pupil shall qualify as an individual with exceptional needs . . . if the results of assessment . . . demonstrate that *the degree of the pupil's impairment* described in §3030 (a through j) requires special education . . . . The decision as to whether or not the assessment results demonstrate that the degree of the pupils impairments require special education shall be made by the [IEP] team . . . .

5 Cal. Code Regs. §3030.

The district court determined the degree of L.J.'s impairment did not require special education. It erred because it disregarded L.J.'s formal assessment and long history of impairments. The court instead improperly relied upon Teacher Ramos' subjective opinion to conclude that L.J.'s degree of behavior impairment lessened sufficiently at the time of the IEP meetings to render special education services unnecessary and L.J. ineligible. [ER28:1-25]. The court cited *Hood v. Encinitas Union High School Dist.*, 486 F.3d. 1099 (9th Cir. 2007) as support. [ER29]

The holding in *Hood*, is distinguished by its facts and does not apply here because L.J. has three qualifying disabilities and his needs could not be met with "accommodations" provided as part of the "regular instructional program."

In *Hood*, despite attention deficits related to suspected epilepsy, 10-year old Anna demonstrated above average ability on cognitive testing conducted by Encinitas as part of an evaluation to determine her eligibility under the IDEA. *Hood* at 1101. Her academic achievement on eleven standardized tests was

"average or better." *Id.* "One (writing sample) was in the "very superior" range, eight were in the "high average" range, one (reading fluency) was in the "average" range, and one (math fluency) was in the "low average" range." *Id.* Anna took medication to manage her impairment. *Id.* at 1102.

The Court in *Hood*, affirmed the district court's determination that Anna "was not entitled to special education based on a '*specific learning disability*.[6]'" *Id.* at 1104. However, the Court based its holding on Anna's failure to refute that "accommodations" Encinitas provided, pursuant to a §504[7] plan, constituted regular education services that met her needs. *Id.* at 1103.

The "accommodations" Encinitas provided under the §504 included: "preferential seating in the classroom, use of a graphic organizer and AlphaSmart keyboard, one-step directions, visual support for instruction and concepts, frequent prompts and checks for understanding, and daily teacher checks for homework assignments." *Id.* at 1102. After Encinitas implemented Anna's §504 plan for one year, it modified the plan thereafter "changing it only to add an accommodation addressing Anna's mother's concern about her daughter's self-esteem." *Id.* at 1102.

Here, L.J. received and required services that do not constitute "regular or

---

[6] The *Hood* court did not address eligibility under SED or OHI categories.

[7] As here, the § 504 plan in *Hood* referred to the Rehabilitation Act of 1973, 29 U.S.C. §794, which requires, in part, equal access to the benefits of public education for disabled children.

categorical services offered within the regular instructional program" because he had confirmed disabilities and extreme needs. Unlike Anna's assistive technology (Alpha smart and graphic organizer) and preferred seating, L.J.'s extreme needs necessitated direct intervention services and delivery of instruction in modified settings that are not afforded as part of "regular" instruction" for a non-disabled student.

As the district court acknowledged, regular education instruction does not provide 1:1 direction and redirection. [ER27:9-10]. Nor does regular education provide: persistent teacher oversight; discretion to leave class at will; options to complete classwork or tests in other classrooms, the office or with 1:1 support with additional time; shortened assignments or psychological counseling.[8]

Third-grade Teacher Gonzalez testified extensively to L.J.'s inappropriate behavior and lack of academic progress in the general education classroom—even with interventions such as 1:1 counseling, classroom aides, consultations with the district's behavior specialist and several behavior intervention plans. [ER1282-1289,1291-1292] Along with the 7/4/11 Comprehensive Mental Health

[8] The district accepted that therapy sessions were available as general education. [ER27:23-25]. However, PUSD's contracted with Lincoln expressly to provide "special education and related services" that were not part of PUSD's regular school program. [ER884,904,924]. L.J. could not argue and submit proof that therapy L.J. received was not within PUSD's regular school program as progress notes documenting that therapy were not produced. [ER27:23-24].

Assessment [*supra.*, at pp. 11-12] Teacher Gonzalez provides a baseline for L.J.'s behaviors and illustrated his academic challenges absent an IEP that prescribed appropriate and sufficient special education and related services.[9]

Toward the end of 3rd grade, L.J. received specially designed instruction in Teacher Ramos' class, which was designed and implemented as part of an IDEA mediation agreement, until L.J. was admitted for psychiatric hospitalization. L.J. left his home school (Marina Vista) and attended approximately 2 ½ months of school with Teacher Ramos in a highly-structured classroom. L.J. had a trained 1:1 behavior aide who remained within arms-length of him until his hospitalization. L.J.'s aide followed his tailored behavior plan with "fidelity". [ER1374-1375] His teacher simply "looked over it" and was never trained to follow the behavior plan. [ER1320]

With deference to the ALJ, the district court accepted that L.J. did not require special education finding L.J.'s behaviors abated despite fading of 1:1 support at the end of 3rd grade and in Teacher Ramos' class and that he did not require 1:1 intervention, a behavior plan or special instruction. [ER27:9-12]. However, according to the aide's own testimony and that of Teacher Ramos, 1:1 support did not "fade out" as the ALJ had concluded. The aide assisted L.J. with homework, redirected him to task, instructed him in self-regulation and provided

[9] L.J. exhibited the need for such services continuing from 2nd grade. [ER1:28-2:1]

positive reinforcement, at least until L.J. was admitted to a psychiatric hospital for six days, with only twelve calendar days remaining in that school year. The record here demonstrates that the district court erred by failing to recognize that the ALJ's finding that L.J. was able to function in the regular education class after fading of his 1:1 aide, was clearly erroneous and did not warrant deference.

The stipulated modifications L.J. received in May 2012, including 1:1 intervention, and delivery of instruction in accordance with a revised behavior plan, constituted special education that the parties, negotiated and agreed upon, delivered without an IEP. But L.J. received some specially designed instruction to address his most urgent needs stemming from his known ADHD.

In fourth-grade, PUSD selected Teacher Hatfield to provided adapted instruction to L.J. because he had prior and necessary experience working at a charter school for children with behavior challenges. Still, without an IEP, Teacher Hatfield was unclear about the nature of L.J.'s disabilities; did not know when or what medications L.J. was taking; and, was perplexed by L.J.'s bizarre behaviors. Although Teacher Hatfield testified that L.J.'s behaviors, for the most part, were manageable "with me," he did not disclose that L.J. had ongoing behavior challenges, particularly with substitute teachers. After-acquired school records documented that L.J.'s historic behavioral deficits continued in fourth-grade.

Importantly, PUSD's regular education program lacked any requirement to assess, place, serve, measure, re-evaluate, review or provide continuity of services for L.J. PUSD's label of "regular education" did not ensure, but circumvented the IDEA procedural safeguards necessary to due process, including, access to school records, notice, informed consent and meaningful parent participation in educational decisions concerning L.J. PUSD's "regular" education program could not and did not provide L.J. a FAPE.

The district court's interpretation of California Education Code §56026, that distinguished "modifications" from special education, conflicted with the IDEA's definition of special education and erected a barrier to an IDEA primary purpose, "to ensure that all children with disabilities have available to the a [FAPE] that emphasizes special education and related services to meet their unique needs." §1400(d). The court erred as a matter of law because L.J. proved he requires special education.

### C. L.J. Proved He Was Eligible Under the IDEA Because He Required Special Education and Related Services To Address Unique Needs Caused By His Emotional Disturbance, Other Health Impairment and Specific Learning Disability

The severe and chronic nature of L.J.'s disability necessitated specially designed instruction within the meaning of the IDEA. With the passing of each school year, L.J. became more difficult to restrain, in part because he did not

receive necessary special education and related services under the IDEA. PUSD's "regular school program" did not include sufficient modified instruction or related services that L.J. needed, as evidenced by the nature and intensity of his ongoing impairments. Although L.J. received specially designed instruction in general education classes, it did not include consistent 1:1 monitoring and therapeutic intervention, small group instruction, shortened assignments, or time-out from class which L.J.'s severe disabilities made necessary.

Contrary to the ALJ's findings (adopted by the district court) L.J. was *not* performing well behaviorally, socially, or academically between May and October 2012 even with PUSD's *ad hoc* interventions. He was frequently ousted or allowed to leave the classroom, "oftentimes" had trouble on the playground, lost the ability to self-regulate, eloped from the school, attacked the principal, required 1:1 intervention from a burly male behavioral aide which "almost" kept him on task, repeatedly ideated and attempted suicide, was hospitalized at the age of 8 in a psychiatric ward for a week during the school year and twice more over the summer, became reliant on psychotropic medications which made him physically ill, and required placement with a male teacher with extensive experience educating children with severe behavioral needs. This was not a student who was "performing well".

### D. The District Court Erred As A Matter Of Law By Finding Ineligibility Based Upon a Brief Timeframe When L.J.'s Had A Longstanding & Ongoing Need For Special Education

Even if L.J.'s performance had improved behaviorally, socially and academically from May 30 – October 9, 2012, his relative performance in this narrow time slice does not warrant a denial of eligibility. The district court erred when it determined L.J. ineligible at the time of his IEP meetings based upon its misinterpretation of the "snapshot rule" from *Adams v. Oregon*, and therefore found that prior and subsequent evidence on L.J.'s need for special education was immaterial. [ER28:2-5;28:9-11;29:12-23, *see also* pp.13:12-17 & 17:5-8]. It erred further by determining the nature of the services L.J. required was not special education under the IDEA. 34 C.F.R. §300.39(b)(3). The ALJ and district court essentially found L.J. was well enough between May 27 and October 9, 2012, that he no longer required special education, despite psychiatric hospitalization during summer break. [ER28:2-29:11]. Moreover, no assessment or objective data supported the court's assumption that PUSD's temporary "accommodations" were causally related to L.J.'s brief relative calm, for example, rather than medications or the historic cyclical nature of L.J.'s escalations. Moreover, the 2/15/13 Comprehensive Assessment diagnosed his "variable functioning" and "sporadic" difficulties occurring over the past year. [ER757]

The IDEA requires eligibility to be determined based upon:

> a variety of assessment tools and strategies to gather relevant functional, developmental and academic information . . . that may assist in determining . . . whether the child is a child with a disability . . . ."

20 U.S.C. §1414(b).

> As part of an initial evaluation . . . and any reevaluation, the IEP team and other qualified professionals . . . [must review] existing evaluation data . . . current classroom-based, local or State assessment *and* classroom-based observations [by] teachers and related service providers . . . and . . . input from the child's parents . . . to determine whether the child is a child with a disability [under the IDEA].

20 U.S.C. §1414(c).

The IDEA does not allow an IEP team, reviewing agency or court to deny eligibility based upon subjective teacher opinion regarding classroom performance or limit consideration of student's disability needs at the time of an IEP team meeting, or isolated from formal assessment data. The district court erred as a matter of law when it interpreted California Education Code §56026(b) as authority to deny L.J.'s eligibility.

Here, with the assistance of medication and specially designed instruction, L.J. had periods of temporary behavioral and academic gains since second grade. However, neither the district court nor the ALJ identified objective evidence to demonstrate that fewer behavioral incidents between May 30 and October 9, 2012 meant L.J.'s multiple disabilities did not necessitate special education.

By the district court's own reasoning, relevant mitigating factors must be considered in determining special education eligibility. The district court repeatedly pointed to the ALJ's failure to consider the impact of the accommodations and modifications PUSD provided to L.J. during Spring and Fall 2012 and the impact on his behavioral, academic and social performance. When behavioral intervention and specialized instruction were stripped away, L.J. easily met eligibility criteria in three qualifying categories. Further, neither the ALJ nor the district court addressed the mitigating factor of L.J.'s psychotropic medications.

L.J.'s therapist testified extensively regarding L.J.'s mood disorder/emotional dysregulation and his reliance upon psychotropic medication. [ER1479-81,1488-91, 1495, 1499-1500; 603; 304:6-12; 305:10] She recommended therapeutic placement where the teachers understood the nature of mental illness. [*Id.*] L.J.'s mother submitted uncontroverted evidence regarding the type, dosage, purpose and side-effects of L.J.'s psychotropic medications. [ER722-735; 1505-06, 1545-1551;851]. Teacher Hatfield opined that L.J.'s behavior worsened when he had not taken his medication. [ER755] School-based counselors repeatedly expressed their concern regarding his medication management. [*Infra.* p.57.] Dr. Burke underscored L.J.'s reliance upon his medication regime. [ER628, 644, 601;995:6-14]. After-acquired evidence documented increased somatic complaints

(heartburn) after L.J. started his medications. [ER753] Nevertheless, neither the ALJ nor the district court considered the overlay of his substantial pharmaceutical regime on his SED. Surely, if mitigation must be considered in determining whether L.J. had one or more disabilities, it must also be considered in determining whether L.J. required special education.

### E. PUSD's Specially Designed Instruction was Insufficient to Ensure L.J. Received a FAPE

PUSD's failure to identify L.J. as eligible under the IDEA and its resulting failure to develop an appropriate IEP for him denied L.J. a FAPE. *Dept. of Educ. V. Cari Rae S.*, 158 F. Supp. 2d 1196-97 (D. Haw. 2001). When a child requires special-education services, a school district's failure to propose an IEP of any kind is at least as serious a violation of its responsibilities under IDEA as a failure to provide an adequate IEP. *Forest Grove School Dist. v. TA,* 129 S. Ct. 2484, 2491 (2009). As the district court acknowledged, PUSD was required to provide L.J. a FAPE if he was eligible under the IDEA. L.J.'s multiple disabilities cannot be disputed and his resulting needs were for special education. The ALJ erred by constructing a state law exception to IDEA eligibility, which turned upon location or label as general education "modification."

A child's special education needs include academic, social, health, emotional, communicative, physical and vocational needs. *Seattle School Dist. No.*

*1 v. B.S.*, 82 F.3d 1493, 1500 (9th Cir. 1996). L.J. was unable to remain in class consistently, under-achieved in mathematics, and his SED seriously impaired his social development and interactions at school. The school district's modifications in the general education classroom failed to address the range of L.J.'s educational needs in the areas of academics, social/emotional, health, and behavior, and therefore PUSD denied L.J. a FAPE.

**III. The District Court erred when it determined that PUSD's failure to provide L.J.'s mental health school records, conduct a nurse's assessment and include Teacher Gonzalez in the eligibility process constituted harmless error.**

The district court properly rejected the ALJ's assertion that a procedural violation is actionable only where the student has already established substantive eligibility. [ER15] See, also, *Hacienda La Puente Unified Sch. Dist. v. Honig*, 976 F.2d 487, 492 (9th Cir. 1992) (rejecting the argument that a child must be identified as disabled or handicapped before the IDEA's procedural safeguards can be invoked). The district court found that L.J. proved that the school district committed a procedural violation by failing to disclose L.J.'s mental health school records. [ER16] The records were directly related to manifestations of L.J.'s SED at school and were maintained by or on behalf of PUSD. [*Id.*] PUSD referred L.J. to the Lincoln agency and paid for L.J.'s treatment and evaluations. Nothing in the

IDEA protects PUSD from producing school documents that it caused to be created. Section 1415(b)(1) of the IDEA required PUSD provide L.J.'s parent with the "opportunity to examine" Lincoln mental health school records which PUSD "used" to evaluate and treat L.J. regardless of whether the records were located at the Lincoln Center or PUSD offices.

The district court concluded that L.J. did not prove, by a preponderance, that PUSD's procedural violation impeded his right to a FAPE or seriously infringed his parent's right to participate in the IEP formation process because L.J. was better at the time of his IEP meetings. [ER17] On this basis, the district court determined that L.J. did not establish that PUSD's failure to provide L.J.'s mental health school records resulted in a denial of a FAPE. [*Id.*] The court considered PUSD's failure to disclose the records, as well as the failure to provide a nurse's assessment and failure to include Teacher Gonzalez in the IEP eligibility process, harmless or immaterial procedural violations. [ER17-19]

The court's harmless error determinations included that (1) the district court erred in concluding that "nothing" in the mental health school records provides material evidence supporting L.J.'s need for remedial special education, (2) the district court erred in determining that a nurse's assessment (for a student with a qualifying health impairment, multiple hospitalizations, under the care and treatment

of a psychiatrist and taking daily, multiple psychotropic medications which make him ill) was unnecessary; and (3) the inclusion of Teacher Gonzalez in the eligibility process would have provided no new, material information, and therefore the District's failure to conduct these activities did not seriously infringe Parent's ability to participate in the IEP formation process [*Id.*] The court erred, as a matter of law, when it considered too narrow a time frame, the IEP dates, to find L.J. ineligible.

**A. PUSD's failure to disclose L.J.'s mental health school records significantly impeded his Parent's opportunity to participate in the decision-making process.**

In addition to ensuring a FAPE, the IDEA was enacted to guarantee that the rights of children with disabilities and their parents are protected. 34 C.F.R. §300.1(b). Parents have the right to informed consent. *Consent* means that the parent has been fully informed of all information relevant to the activity for which consent is sought. 34 C.F.R. §300.9(a). Parents have the right to inspect and review all educational records with respect to the identification, evaluation and educational placement of the child and the provision of FAPE to the child and to receive such records prior to any due process hearing. §1415(b)(1); 34 C.F.R. §300.501(a). )*; Cal. Educ. Code* §§56505[e][7], 56043[v], and 56504. Parents have the right to participate in meetings with respect to the identification,

evaluation, educational placement and the provision of FAPE to their child. 34 C.F.R. §300.501(b). Parents have the right to invite individuals with knowledge or special expertise regarding their child to attend IEP meetings. 34 C.F.R. §300.321(a)(6). The IDEA ensures parents' rights to prior written notice which must be provided a reasonable time *before* the school district changes or refuses to change the identification, evaluation, educational placement or the provision of FAPE to their child. 34 C.F.R. §300.503(a). These rights are necessary and apply during the eligibility process.

PUSD's actions, deliberately withholding L.J.'s material mental-health school records, directly impacted Parent's procedural rights and resulted in the substantive denial of eligibility (and therefore a FAPE) for L.J. Moreover, PUSD's withholding of these records hid the fact that L.J. had been receiving specially designed instruction and supports for years without an IEP. The district court correctly found that L.J.'s mental health school records were relevant, constituted educational records and were impermissibly withheld from Parent's review. The District Court erred in concluding that the withholding of L.J.'s mental health records was harmless error. [ER17:18-24]

Importantly, L.J.'s parents had the right to have L.J.'s mental health providers at both the May and October 2012 IEP meetings. 34. C.F.R. §300.321(a)(6). These knowledgeable counselors would have verified L.J.'s

reliance on mediation, the variability of mitigation from medications, his need for individualized instruction, and his inability to self-regulate his emotions. Had L.J.'s Parent been aware of the content of the assessments and treatment plans she would not have waived the therapists' attendance.

These mental health therapists provided 1:1 counseling to L.J. beginning in the 2nd grade and continuing throughout his 3rd grade year and were the only professionals with extensive, first-hand knowledge of his school-based mental health needs. They could have opined about L.J.'s ongoing needs as revealed by Lincoln assessments, treatment plans and progress notes. However the therapist did not attend either the May or October 2012 IEP meetings and, except for a short note, none of their assessments, progress notes or treatment plans were made available to L.J.'s mother, Dr. Burke or L.J.'s IEP teams for consideration. [ER762-763]

At the very least, L.J.'s Parent should have received a copy of the extensive progress notes, assessments and treatment plans existing as of the May and October 2012 IEP meetings so that she could provide informed consent regarding the exclusion of his school-based mental health providers from the IEP team. She further required *all* of L.J.'s mental health school records prior to the April 2013 due process hearing.

PUSD's withholding of L.J.'s school records violated the IDEA's procedural safeguards necessary to due process at the administrative hearing. Progress notes document his need for "intensive" in-class, playground and office intervention [ER869, 872, 873, 875], reliance on medication [ER753, 754, 755, 758, 743, 744, 802, 813, 820, 841 851], need for continuing supports [ER760]; and frequency and duration of classroom disruption and exclusion from the general education curriculum and social opportunities inherent to school. [ER841, 820, 819, 817, 813, 811]. PUSD withheld necessary evidence from hearing.

Contrary to Teacher Hatfield's April 10, 2013 testimony, he reported in a 2/15/2013 Treatment Plan withheld by PUSD that L.J. complied with classroom instructions only 1 out of 3 times. [ER744]. The sum of the progress notes, along with the findings in the District's 2/15/13 Comprehensive mental health assessment and Treatment Plan, directly contradicted the testimony of L.J.'s teachers regarding his disability-related needs. By withholding the mental health school records, PUSD deprived Parent of crucial evidence to corroborate her testimony and that of Therapist Clark regarding L.J.'s continuing health, behavior academic and mental health-related needs. PUSD further deprived L.J. of evidence that refuted the testimony of Teacher Hatfield, Director Daly and Dr. Burke and Behaviorist Catalde.

The mental health school records, particularly the detailed progress notes, documented L.J.'s extensive and long-term 1:1 counseling which PUSD provided from Spring 2011 through the date of his May 30, 2012 IEP meeting. The failure of this allegedly successful "general education" intervention was material to show the intervention did not ensure L.J.'s FAPE in the general education setting. Further, as L.J. argued at the summary judgment hearing, standardized rating scales Teacher Hatfield completed for the 2/15/13 Comprehensive Assessment contained his observations from the entire school year, including the October 2012 time frame, materially differed and more likely documented L.J.'s needs. [ER267:6-12]. In addition, PUSD's 7/4/11 assessment triggered a requirement for the assessor to attend L.J.'s May 2012 and October 2012 IEP meetings and for the IEP team to consider that assessment when deciding L.J.'s eligibility. 20 U.S.C. §1414(c)(1); 34 C.F.R. §300.321(a)(6). Any waiver of the therapists' attendance was without informed parental consent. *See* Cal. Educ. §56341(g-h). Accordingly, PUSD's withholding of the 7/4/11 assessment report and the other relevant mental health school records prevented meaningful parent participation at L.J.'s IEP team meetings and denied L.J. a FAPE.

.

**B. PUSD's failure to assess in the area of health significantly impeded L.J.'s parent's opportunity to participate in the decision-making process.**

The district court found that **L.J.** did not meet his burden to show PUSD's failure to provide a health assessment significantly impeded his parent's opportunity to participate in the decision-making process. [ER18] Parent testified that she provided a signed copy of the August 23, 2012 assessment plan and authorization to release her child's psychiatric records to PUSD on the condition that a health assessment would be conducted by the school nurse and that Teacher Gonzalez be included in the eligibility process. Mother irrefutably testified that she signed and returned the modified assessment plan. [ER1541-42] However, the district court deferred to the ALJ's finding that, because L.J. failed to produce a signed copy of the assessment plan, there was "no evidence" of such agreement. [ER18] The district court added that, even if there were such an agreement, a nurse's assessment would only be helpful if there is a need to administer medication at school. [Id.] Since L.J. did not need medication to be administered at school, the district court concluded that the assessment was unnecessary and would not have provided *any* new information. [Id.] A parent-signed version of the modified Assessment Plan was unnecessary to finding that PUSD was obligated to conduct the nurse's assessment because the IDEA required PUSD to conduct it regardless.

To determine eligibility, the student must be assessed in *all areas related to the suspected disability* including health and development, general ability, academic performance, self-help, and social and emotional status. A developmental history is obtained, when appropriate. 34 C.F.R. §300.304(c)(4); Cal. Educ. Code §56320(f), *see, e.g.,* 5 Cal. Code Reg. §3030[10]. Assessments must be administered by qualified personnel knowledgeable of that disability. Cal. Educ. Code §56320(g), 5 Cal. Code Reg. §3023(a) In the case of a child such as L.J. having a diagnosed chronic illness, the IEP team must review the type of chronic illness, possible medication side effects and complications of treatment that could affect school functioning and the educational and social implications of the disease and treatment to include but not limited to the likelihood of fatigue, absences, changes in physical appearance, amputations or problems with fine and gross motor control. 5 Cal. Code. Reg. §3021.1.

The district court erred in finding that PUSD's failure to assess in the area of health did not significantly impede L.J.'s Parent's opportunity to participate in the decision-making process. L.J.'s mother had no meaningful opportunity to participate in the determination of L.J.'s eligibility by sharing an understanding of

[10] "The decision as to whether or not the assessment results demonstrate that the degree of the child's impairment requires special education shall be made by the IEP team. . . . The IEP team shall take into account all the relevant material which is available to the child." [*Id*.]

the influences of medication or potential organic factors that influenced his behaviors and his deficient academic performance because PUSD declined to assess L.J.'s health-related needs, as required by law or when his parent requested it. Instead, PUSD unilaterally decided and later argued, such assessment was required only for children taking medications at school. PUSD's decision and the court's adoption of it were contrary to statutory and prevailing authority which mandates such health assessments and written prior notice if PUSD refused to conduct it. 20 U.S.C. §1415(b)(3). PUSD's refusal violated IDEA procedural safeguards, prevented meaningful parental participation and denied L.J. a FAPE.

"Parental participation in the IEP and educational placement process is central to the IDEA's goal of protecting disabled students' rights and providing each disabled student with a FAPE." *Doug C. v. Hawaii Dept. of Educ.*,720 F.3d 1038, 1040 (9th Cir. 2013); *see also* 20 U.S.C. §1415(b)(1). Yet, the district court permitted PUSD to impose multiple barriers to parental participation, including refusing to conduct any assessment in a key area of health, which related to L.J.'s SED, and potentially his OHI, needs.

The August 23, 2012 Assessment Plan notified L.J.'s mother that health information was gathered for the purpose of determining how L.J.'s health affects his performance. PUSD's accompanying Authorization for Release of Records includes the request for permission for Dr. Burke *and a Nurse* to review L.J.'s

medical records. [ER615] Nevertheless, PUSD did not assess L.J.'s health-related needs including the effect of multiple medications upon his classroom performance, reports and letters from his psychiatrist and psychologist, or any treatment-related complications.

The nurse's assessment was necessary for the IEP team to consider the impact of L.J. health status in relation to his IDEA eligibility. PUSD's failure to conduct it was not harmless error. The failure to assess a student in a single area of suspected disability can constitute a denial of FAPE. *Simmons v. Pittsburg Unified School District*, Case No. 4:13-cv-04446-KAW. (N.D.Cal. 2014) *citing*, *W.H. v. Clovis Unified Sch. Dist.*, No. CV F 08-0374 LJO DLB, 2009 WL 1605356, at *18 (E.D. Cal. June 8, 2009) (failure to assess a child in the area of written expression constituted a procedural violation that deprived the child of educational benefits). PUSD's failure to conduct the Nurse's assessment denied L.J. a FAPE because it compounded PUSD's failure to provide mental health documents which further showed a health assessment was necessary. 20 U.S.C. §1414(c)(2).

The failure to timely provide portions of information concerning a child's impairment or disability also may constitute a denial of FAPE. *see Amanda J., v. Clark County School District*, 267 F.3d 877 (9th Cir. 2001) (failure to timely disclose child's records to her parents, particularly evaluations indicating possible

autism and suggesting further psychiatric evaluation was needed, constituted egregious procedural violations that denied the child a FAPE), *MM v. Lafayette*, 767 F.3d 842 (9th Cir. 2014) (District violated the IDEA by failing to ensure that the Response to Intervention data was documented and carefully considered by the entire IEP team and failing to furnish the parents with the data, thereby making the parents unable to give informed consent.) PUSD's failure to timely disclose the mental health assessments, treatment plans and progress notes denied L.J. a FAPE.

The evidence in the record proved that L.J. continually had special education needs associated with his medication and treatment for his mood disorder and ADHD, which adversely impacted his academic, behavioral and social performance, despite Teacher Hatfield's interventions. After-acquired records showed L.J.'s reliance on medication to control his mood regulation and impulsivity and his increased somatic complaints after taking them. [*Supra*. p.57] Parents attested to side-effects from the medications. [*Supra*. p.50] Therapist Clark wrote a letter and testified as to his need for medication management [ER617]

L.J.'s mental health record supported L.J.'s parents' testimony to refute Teacher Hatfield's opinion that he adequately addressed L.J.'s needs without an IEP. Indeed, PUSD, having failed to conduct a health assessment, had not properly identified L.J.'s needs in the first place. When reviewing the record as a whole, then, the preponderance of the evidence establishes that by failing to assess L.J. in

the area of health, PUSD substantially impeded L.J.'s parents' participation in the IEP process and deprived L.J. of an educational benefit. For these reasons, PUSD's failure to assess L.J. is not harmless as a matter of law and denied him a FAPE.

### C. The District's Refusal to Include L.J.'s Third Grade Teacher in the Special Education Assessments and Eligibility Determinations Significantly Infringed upon Parent's Right to Participate in the IEP Formation Process.

The district court relied heavily upon testimony of Teacher Gonzalez, L.J.'s primary 3rd grade teacher because she was the only witness to L.J.'s "baseline" measure of academic, behavioral, and social/emotional needs. She was aware that he became "very sleepy" in class when on medication and his needs required her to work closely with his mother to monitor L.J.'s well-being and health. [ER1290] L.J. attended Teacher Ramos' class for only 42 days and had the cumulative benefit of a 1:1 aide working within "arm's length of him. [ER701] L.J. had been in Ramos' class for a few weeks when Dr. Burke required Teacher Ramos to complete the Achenbach Behavior Rating Scales, and she acknowledged that discrepancies between Ramos' ratings and those of L.J.'s parent likely were due to L.J.'s brief period in Ramos' classroom. [ER637] Similarly, when Burke

conducted her supplemental assessment on September 21, 2012, L.J. had been in Teacher Hatfield's class for less than a month. [ER609]

Yet PUSD omitted Teacher Gonzalez extensive knowledge of L.J. when it obtained standardized behavior rating scales. Dr. Burke never interviewed Teacher Gonzalez as part of L.J.'s assessments and PUSD excluded her from L.J.'s IEP team over his parent's objections, in violation of the IDEA. 34 C.F.R. §300.321(a)(6). Had Teacher Gonzalez provided her opinion on rating scales or at IEP meetings, consistent with her hearing testimony, it would have been clear that L.J. required special education and related services to receive a FAPE.[11]

## CONCLUSION

L.J. required and was entitled to special education eligibility from at least third grade through the present because he is disabled under multiple IDEA

[11] PUSD's violation was not "cured" by the due process hearing itself. *See, e.g. Forest Grove,* 129 S. Ct. 2484, 2495. **[**The IDEA affords parents substantial procedural safeguards, including the right to challenge a school district's eligibility determination and obtain prospective relief. However the "review process is ponderous" and therefore inadequate to ensure that a school's failure to provide a FAPE is remedied with the speed necessary to avoid detriment to the child's education. *Citing, Burlington School Comm. v. Mass. Dept. of Ed.*, 471 U.S. 359, 370 (1985).] Like *Forest Grove* and *Burlington,* this case also demonstrates the problem of delay, as L.J.'s mother first sought a due process hearing in August 2012, and the district court issued its decision in May 2014, after L.J. was expelled from public school.

categories. PUSD thwarted L.J.'s eligibility its failure to assess L.J. in all areas related to his disability, withholding material school records, the exclusion of his teacher from PUSD's eligibility determination process, random and sporadic interventions and obstruction of Parent's participation in his education decisions. The district court's holdings to the contrary should be reversed and L.J. should reasonable recover attorney fees.

Dated: June 29, 2015

Respectfully submitted,

__/s/ Jean Murrell Adams______

Jean Murrell Adams
ADAMS ESQ, a Professional Corp.
1300 Clay Street, Suite 600
Oakland, CA 94612
(510) 832-6000

## REQUEST FOR ORAL ARGUMENT

Appellants request oral argument on their claims addressed by this appeal.

## STATEMENT OF RELATED CASE

No related cases are currently pending.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains **13,953** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced type face using Word 2010 software in 14-point Times New Roman font.

Dated: June 29, 2015

/s/ Jean Murrell Adams
Jean Murrell Adams, Attorney

## CERTIFICATE OF SERVICE

for

## APPELLANTS' OPENING BRIEF

I, hereby certify that I electronically filed the forgoing with the Clerk of the Court for the United States Court of Appeals for the 9th Circuit Court by using the appellant CM/ECF System on June 29, 2015.

I certify that all participants are participants in this case are registered CM/ECF users and that service will be accomplished by the appellant CM/ECF system.

__/s/ Jean Murrell Adams______
Jean Murrell Adams, Attorney